IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LILLIAN NATAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:18-cv-1178 (AJT/MSN) |
| | ) |
| ARLINGTON COUNTY PUBLIC SCHOOLS, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lillian Natal was formerly employed by Defendant Arlington County Public Schools. In this action, she alleges that Defendant created a hostile work environment, interfered with her FMLA benefits, and ultimately terminated her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"), all in retaliation for her filing of a charge of discrimination. *See* [Doc. 1]. Defendant has moved for summary judgment as to all of Plaintiff's claims. *See* Defendant's Motion for Summary Judgment Filed Pursuant to Fed. R. Civ. P. 56(a) [Doc. 24] ("the Motion"). The Court held a hearing on the Motion on June 7, 2019, following which it took the Motion under advisement. For the reasons stated herein, there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. The Motion is therefore GRANTED and this action is DISMISSED.

### I. BACKGROUND

Unless otherwise noted, the facts set forth in this Part are undisputed.

Plaintiff began working for Defendant in 1995 and became an Administrative Assistant in Defendant's Extended Day Program in 2016. [Doc. 1 at ¶¶ 17, 18]. Beginning in 2008 and until she was terminated in 2017, Plaintiff reported to Robert Kaplow, the Director of the Extended Day Program. [Doc. 27-1 at 2–3]. She was also "obligated to take direction" from Ben Harris, the Extended Day Program's Assistant Director. [Doc. 27 at ¶ 6]; *see also* [Doc. 28 at ¶ 6]. Although the parties disagree over Plaintiff's specific job duties and responsibilities, including specifically whether Plaintiff was required to "place" substitutes in the Program or simply to call them and "try to place them in vacancies," the record establishes that plaintiff spent the majority of her time contacting potential substitutes in an attempt to fill vacancies. [Doc. 27-2 at 5].[1]

Plaintiff has received negative performance evaluations since 2012, particularly in the areas of "Quality of Work," "Professionalism," and "Human Relations Skills." *See, e.g.*, [Docs. 27-25; 27-26]. The record documents multiple incidents of poor performance, including a 2012 record of discussions about Plaintiff's unprofessional conduct and failure to satisfactorily complete required tasks [Doc. 25-26 at 99], a September 9, 2016 memorandum from Mr. Kaplow to Plaintiff recording inappropriate and unprofessional comments Plaintiff made to Mr. Kaplow in a meeting [*id.* at 109], reports in October and November 2016 of Plaintiff inappropriately

---

[1] Plaintiff contends that her duties
> included receptionist duties, handling payments from parents, communicating with substitutes regarding their placement at Extended Day sites, providing support to Extended Day supervisors and assistant supervisors, communicating with vendors regarding purchases, and negotiating prices. Ms. Natal's duties included contacting substitutes to try to place them in vacancies, but she could not require any substitute to take a specific vacancy. Some substitutes did not want to go to certain areas or only wanted placements in certain areas.

[Doc. 28 at ¶ 9 (citations omitted)]. Defendant contends that her duties
> should have included (a) monitoring staff absences at the APS sites and ensuring substitutes were placed; (b) purchasing; (c) reserving rooms; (d) managing the front welcome center; (d) overseeing two customer service clerks; (e) answering phones; (f) checking emails; (g) the administrative side of hiring (i.e., preparation of paperwork); (h) responding to the needs of school site supervisors; (i) dealing with customers; and (j) acting as liaison between the Extended Day Program and other APS departments.

[Doc. 27 at ¶ 9 (citation omitted)].

commenting on a parent and a co-worker's personal lives [*id.* at 102, 104, 111], documented reports in February 2017 of Plaintiff's failing to properly complete work tasks and record meeting minutes [*id.* at 74, 83], and a March 2017 email from a manager in a different Arlington County Public Schools department complaining of Plaintiff's uncivil behavior toward her and her staff [*id.* at 113].

On May 22, 2017, Mr. Kaplow placed Plaintiff on a Performance Improvement Plan ("PIP"). [Docs. 27-2 at 12; 27-6]. The PIP listed multiple areas in which Mr. Kaplow claimed that Plaintiff was not meeting expectations, including Quality of Work, Quantity of Work, and Human Relations Skills. *See* [Doc. 27-6]. Within these broad categories, the PIP listed specific areas of concern, including Plaintiff's alleged failure to place substitutes, which Mr. Kaplow testified was his primary concern in placing Plaintiff on the PIP. [Doc. 27-1 at 5]. Subsequent to the PIP's initiation, Mr. Kaplow and Plaintiff met and reviewed Plaintiff's status on at least six occasions, after which Mr. Kaplow memorialized the meeting in the form of a memorandum to Plaintiff. *See* [Docs. 27-7, 27-8, 27-9, 27-10, 27-11, 27-12]. The PIP was set to expire on, and Plaintiff was to meet the goals of the PIP by, July 15, 2017. [Doc. 28 at 17].

On July 10, 2017, before the PIP deadline, Plaintiff went on leave protected under the Family Medical Leave Act ("FMLA"). [Doc. 1 at ¶ 31]. She remained on FMLA leave until July 28, 2017. *Id.* On August 2, 2017, Mr. Kaplow conducted a PIP monitoring meeting, even though Plaintiff's PIP had expired without her meeting performance expectations. *See* [Doc. 27-11]. One month later, on September 5, 2017, Mr. Kaplow sent Plaintiff a letter explaining that he was extending her PIP deadline to October 31, 2017 to give her additional time to meet the PIP's expectations. *See* [Doc. 27-13].

3

On December 6, 2017, having conducted additional evaluations on September 7, 2017 and October 5, 2017, in which Mr. Kaplow maintained that Plaintiff was not meeting the PIP's expectations, Mr. Kaplow recommended Plaintiff's termination and sent her a 15-page, single-spaced letter outlining in detail the alleged reasons for doing so. *See* [Docs. 27-10; 27-11; 27-26]. Plaintiff challenged this recommendation; and after reviewing the recommendation and administrative record in a closed meeting on June 19, 2018, Defendant (the Arlington County School Board) affirmed the decision and recommendation on June 21, 2018. [Doc. 27-27]. Plaintiff's termination became effective that same day, June 21, 2018. *Id.*

Against this background, the Court has considered Plaintiff's filing of EEOC charges. In that regard, on November 8, 2016, Plaintiff filed her first charge of discrimination against Defendant with the EEOC. *See* [Doc. 27-17]. The charge alleged that although Mr. Kaplow knew "very well" that Plaintiff had an unspecified disability, he treated Plaintiff "with incivility and unfairly" and continually intimidated and harassed her. *Id.* According to Plaintiff, in one instance, Mr. Kaplow told her after she complained about having to sit at a counter that was too low that she would have to sit "wherever they put" her whenever Defendant moved to a new location. *Id.* The charge also alleged that after Plaintiff had a disagreement with one of her co-workers, Mr. Kaplow had given her a negative evaluation in retaliation for her disclosure of that disagreement to Human Resources. *Id.* On June 8, 2017, the EEOC dismissed Plaintiff's charge and issued a Right to Sue Letter. *See* [Doc. 27-18].

On February 13, 2018, Plaintiff filed another EEOC charge against Defendant, alleging, *inter alia*, retaliation, in which she references the November 2016 EEOC charge (referenced as the October 2016 charge), the EEOC Right to Sue letter in June 2017, the PIP instituted in May 2017, her FMLA leave in July 2017, her September 5, 2017 meeting with Mr. Kaplow, the

4

extension of her PIP through October 2017, an incident on September 22, 2017 during which she was "repeatedly yell[ed]at while on her lunch break, and having, "[s]ince September 2017, received "degrading communications about her speech." [Doc. 27-19]. That same day, February 13, 2018, the EEOC wrote Plaintiff's counsel to advise that it would not be opening an investigation into the charge because "further investigation is unlikely to disclose a violation of the law" and issued a Right to Sue Letter. [Doc. 27-20]. Plaintiff subsequently sought reconsideration by letter dated February 23, 2018, [Doc. 27-21], and the EEOC denied that request on February 27, 2018. [Doc. 27-22]. In denying that request, the EEOC stated that "[i]t is important to note that a request for reconsideration does not extend the statutory 90 day period for pursuing this matter in court. If a private lawsuit is not filed within 90 days of your receipt of the February 13, 2018, Dismissal and Notice of Rights, the right to sue will be lost and cannot be restored by EEOC." *Id.*

On June 7, 2018, Plaintiff filed an additional discrimination charge against Defendant with the EEOC that repeated the conduct upon which the charge of retaliation had been previously made in her earlier EEOC charges, adding only that on February 28, 2018, Plaintiff was informed that Mr. Kaplow's recommendation for termination had been accepted, Plaintiff grieved that decision and was placed on administrative leave "on or around April 26, 2018," and on June 4, 2018, she was terminated. [Doc. 27-23]. On June 13, 2018, the EEOC dismissed this latest charge and issued another Right to Sue Letter. [Doc. 27-24]. Plaintiff filed this case on September 14, 2018, within 90 days of her last Right to Sue Letter, issued June 13, 2018, but not any of the earlier Right to Sue Letters. *See* [Doc. 1].

## II. LEGAL STANDARD

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958 (4th Cir.1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. " *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment: the requirement is that there be no *genuine* issue of *material* fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

## III. ANALYSIS

Plaintiff is no longer pursuing her retaliatory hostile work environment claim in Count II, [Doc. 28 at 1 n.1], leaving for consideration her protected activity retaliation claim in Count I and her FMLA retaliation claim in Count III.

### A. Count I (Title VII and ADA Retaliatory Termination)[2]

Plaintiff has not proffered any direct evidence of retaliation and instead relies upon indirect evidence to support her retaliation claims. Under such circumstances, the *McDonnell Douglas* burden-shifting framework applies to both Plaintiff's Title VII and ADA retaliation claims. *See Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001) (applying the *McDonnell Douglas* burden-shifting framework applicable to Title VII retaliation cases to an ADA retaliation case); *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the

---

[2] Given Plaintiff's contention that she did not experience an adverse employment action until she was terminated on June 21, 2018, *viz.*, after she filed her June 7, 2018 EEOC charge (in which she claimed that she had been terminated on June 4, 2018), and that her earlier EEOC charges referenced much of the retaliatory conduct that she now relies on, the case presents substantial issues concerning whether Plaintiff has exhausted her administrative remedies as required or timely filed this action with respect to her retaliation claims. In analyzing that issue, the Court has considered that exhaustion is not a jurisdictional requirement, *see Fort Bend Cty., Texas v. Davis*, ___ S. Ct. ___, 2019 WL 2331306, at *6 (2019), and may under certain circumstances be waived with respect to a retaliation claim, *see Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (holding that "a plaintiff may raise [a Title VII] retaliation claim for the first time in federal court" so long as the claim is "like or related to allegations" contained in a properly exhausted discrimination charge "and growing out of such allegations during the pendency of the case before the Commission" (internal quotation marks omitted) (quoting *Hill v. Western Electric Co.*, 672 F.2d 381, 390 n. 6 (4th Cir. 1982))); *see also Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 303–04 (4th Cir. 2009), *abrogated on other grounds by Fort Bend Cty*, 2019 WL 2331306 (holding that a retaliation claim need not be exhausted administratively so long as it "relates back" to a properly exhausted EEOC charge). Here, Plaintiff alleges that she first experienced actionable retaliation on June 21, 2018, when her employment was terminated; and that she filed this action within 90 days of her June 13, 2018 Right to Sue letter pertaining to her June 7, 2018 EEOC charge. Courts have recognized in this regard that a plaintiff who has properly exhausted a discrimination claim by filing a charge with the EEOC may "piggyback" a retaliation claim "like or related to allegations" contained within the EEOC charge "during the pendency of the case before the Commission." *Mezu v. Morgan State Univ.*, 367 F. App'x 385, 389 (4th Cir. 2010) (internal quotation marks omitted) (quoting *Nealon*, 958 F.2d at 590). But Plaintiff's retaliation claims are not based on her June 7, 2018 protected activity and her June 13, 2018 Right to Sue letter pertaining to that filing, which she relies on for the purposes of assessing the timeliness of this action. Rather, her retaliation claims are based on her earlier November 2016 EEOC charge, the June 8, 2017 Right to Sue Letter pertaining to that charge, her FMLA leave taken in July 2017, her complaints of harassment in September 2017, and the extension of her PIP in September 2018. Neither *Nealon* nor any other Fourth Circuit opinion has addressed exhaustion or timeliness under the specific circumstances presented here. Nevertheless, based on all the facts and circumstances, and Plaintiff's theory of liability, the Court concludes that Plaintiff's claims are not barred because of the exhaustion requirement and were timely filed.

ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases"). Under that standard, to establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer acted adversely against her; and (3) her protected activity was causally connected to her employer's adverse action. *Beall v. Abbott Labs.*, 130 F.3d 614, 619 (4th Cir. 1997). The burden then shifts to the employer "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Id.* If the employer does so, the plaintiff "must demonstrate that the proffered reason is a pre-text for forbidden retaliation." *Haulbrook v. Michelin North America, Inc.*, 252 F.3d 696, 706 (4th Cir. 2001).

Plaintiff engaged in protected activity in November 2016, February 2018 and June 2018; and has taken the position that she first experienced an adverse employment action when she was actually terminated on June 21, 2018. [Doc. 28 at 15–16]. Nevertheless, she has effectively taken the position that because she was terminated because of her earlier negative performance evaluations, those negative evaluations became actionable adverse employment actions once she was terminated. In effect, Plaintiff advances a version of a "cat's paw" theory of liability, *see Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ("When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker."); and the Court has considered Plaintiff's retaliation claim for the purpose of the Motion based on all of the alleged retaliatory conduct following the filing of her November 2016 EEOC charge. *See also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371,

8

377 (4th Cir. 2004) (stating that "a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment'" (quoting *Spears v. Missouri Dep't of Corr. & Human Res.*, 210 F.3d 850, 854 (8th Cir. 2000)). In that regard, the dispositive issue is whether there is evidence sufficient to allow a reasonable fact finder to determine that the negative evaluations were in retaliation for protected activity.

There is no direct evidence of causation between any protected activity and any adverse employment action; and Plaintiff is left with establishing the required causation through temporal proximity. "[E]vidence that the alleged adverse action occurred shortly after the employer became aware of the protected activity is sufficient to satisfy the less onerous burden of making a prima facie case of causation." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (quotation and alterations omitted) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989)). However, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."

It is undisputed that Mr. Kaplow recommended Plaintiff's termination in early December 2017, approximately 13 months after Plaintiff filed her November 2016 EEOC charge and approximately 6 months after the EEOC issued the Right to Sue Letter in June 2017. *See, e.g.*, [Doc. 1 at ¶ 54]. While there is evidence, when viewed most favorably to the Plaintiff, from which a reasonable inference could be drawn that Mr. Kaplow was aware of Plaintiff's November 2016 EEOC charge shortly after it was filed, that protected activity is too remote in time to raise an inference of causation between that protected activity and his recommendation that she be terminated in December 2017. Even if, as Plaintiff alleges, Mr. Kaplow first learned

9

of the November 2016 EEOC charge after the Right to Sue Letter was issued in June 2017, *see* [Doc. 1 at ¶ 25], the December 2017 recommendation was too remote in time as well, *see Hooven-Lewis v. Caldera*, 249 F.3d 259, 278 (4th Cir. 2001) ("A six month lag is sufficient to negate any inference of causation.").

What remains is Plaintiff's contention that she suffered a series of retaliatory actions proximate in time to her protected activity that resulted in her recommended termination in December 2017 and her actual termination on June 21, 2018. Specifically, Plaintiff contends that (1) her negative evaluations on June 26 and August 2, 2017 were in retaliation for her protected activity reflected in the June 8, 2017 Right to Sue Letter[3] and (2) her negative evaluations in September and October 2017 were in retaliation for her earlier protected activity and also her protected activity on September 5, 2017, at which time she complained of harassment.

There is insufficient temporal proximity between any protected activity and any of these alleged retaliatory actions. First, there is no temporal proximity based on the June 2017 Right to Sue letter since a right to sue letter does not itself constitute protected activity and there is no evidence that Mr. Kaplow first learned about her November 2016 protected activity through that Right to Sue letter. He denied knowing about it; and there is no evidence of anyone telling him about it, including Plaintiff. Likewise, the evidence is insufficient evidence to establish that Plaintiff engaged in protected activity on September 5, 2017. Despite her allegation that she complained about retaliation because of her EEOC charge, she testified in her deposition that she never discussed her EEOC complaint with Mr. Kaplow during that meeting, or at any other time. *See* [Doc. 25-2 at 9].

---

[3] *See* [Doc. 28 at 17–18].

Finally, Plaintiff points to the extension of her PIP after its scheduled expiration date, citing in partial support *Crowley v. Perdue*, 318 F. Supp. 3d 277, 295 (D.D.C. 2018), which held that a defendant's leaving a plaintiff "on a PIP for months after Plaintiff met its objectives" allowed for a reasonable inference of retaliatory animus. But as discussed above, Mr. Kaplow's negative evaluations pre-date any protected conduct and continued periodically, in fairly steady progression, until he recommended termination in December 2019; and while some evaluations reflected that Plaintiff had made progress in some areas, the evaluations never reflected an overall acceptable level of performance. And as discussed in connection with plaintiff's FMLA retaliation claim, *see infra*, no retaliatory inference can be drawn from Mr. Kaplow's extension of her PIP in order to provide her with more time to improve her performance after failing to meet the PIP objectives before its original expiration date, unlike in *Crowley*, where the PIP was extended after the plaintiff had *met* all of the performance requirements of his PIP before its scheduled completion.

For all of the above reasons, Plaintiff has failed as a matter of law to proffer evidence sufficient to establish a causal relationship between any protected activity and any adverse employment actions.

Second, even were the evidence sufficient to establish Plaintiff's *prima facie* case of retaliation, the Defendant has presented a legitimate, nondiscriminatory reason for her termination; and she has failed to proffer sufficient evidence that this explanation was not the real reason for her termination, but rather a pretext for retaliation. Defendant has provided substantial evidence that Plaintiff was terminated because of her poor performance over an extended period of time, a clearly non-discriminatory reason. In response, Plaintiff has presented no evidence showing or suggesting that Mr. Kaplow or Defendant did not truly believe that she

was not performing as expected or did not terminate her based upon their belief that she was not meeting the requirements of her position. Plaintiff contends that there is evidence establishing that she was, in fact, performing on some issues, contrary to Defendant's claims; and that her evaluations after June 8, 2017 became markedly more negative.[4] But the record amply reflects that she had consistently failed to meet the PIP's requirements, most of which Plaintiff does not contest. In any event, it is the perception of the employer, not the employee, that is dispositive. *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996); *see also Ramos v. Molina Healthcare, Inc.*, 963 F. Supp. 2d 511, 523 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015) (citing *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998)). In the end, this case is not unlike *King v. Rumsfeld*, 328 F.3d 145 (4th Cir. 2003), where the Fourth Circuit, in affirming a dismissal of plaintiff's discrimination claims on summary judgment, rejected the notion that a plaintiff can create a genuine dispute of material fact as to whether her termination was pretextual by proffering her own testimony that she was meeting expectations:

> Appellee offered substantial evidence that [the plaintiff] was not in fact meeting legitimate job performance expectations, chronicling in detail King's poor performance and his supervisors' numerous concerns. King's response to appellee's evidence is limited to his own claim of satisfactory job performance and to testimony he elicited from his fellow teachers to the effect that his lesson plans were substantially comparable to their own. Neither testimony can sustain a challenge to appellee's proffer that King was not in fact meeting *appellee's* legitimate performance expectations.

*Id.* at 149.

---

[4] For example, Plaintiff points to her evaluation on June 6, 2017, conducted before the issuance of the June 8, 2017 Right to Sue Letter, as compared with her evaluations after June 8, 2018. But while it was noted that she had made some progress, her June 6, 2017 evaluation still listed 7 out of 14 categories in which she failed to meet expectations; and the deficiencies noted in the June 26 and August 2 evaluations in these areas in which she had made progress are based on conduct that occurred after the June 6 evaluation, including Plaintiff's not "display[ing] a respectful, courteous and constructive demeanor at all times." *See* [Doc. 27-8 at 3 ("On June 21, 2017 you displayed disrespectful and inappropriate conduct in a meeting with Ben Harris and me. Please see the memo dated June 22, 2017.")].

In sum, Plaintiff has failed to proffer evidence sufficient to establish a causal connection between any protected activity and her termination or any other adverse employment action or that Defendant's reason for her termination was a pretext for retaliation.

### B. Count III (FMLA Discrimination/Interference)

Count III alleges both FMLA interference and discrimination claims, each of which is governed by a separate provision of the FMLA.[5] Specifically, Plaintiff alleges:

- Defendant unlawfully extended Plaintiff's PIP after she returned from FMLA leave and admitted it did so because of her FMLA leave ([Doc. 1 at ¶¶ 98–99]);

- Mr. Kaplow negatively evaluated Plaintiff for not completing coursework while she was on FMLA leave (*Id.* at ¶ 100);

- Mr. Kaplow's evaluations of the Plaintiff during her PIP claimed that she was excessively absent, specifically noting her FMLA leave (*Id.* at ¶ 101); and

- Ms. Kaplow's negative evaluations of the Plaintiff because of her FMLA leave usage were taken into consideration by Defendant in its decision to terminate her (*Id.* at ¶ 102).

The FMLA provides covered employees with two types of rights and protections. First, employees who take a leave of absence for family or medical reasons are "entitled to a total of 12 workweeks of leave during any 12–month period" for family and health reasons, 29 U.S.C. § 2612(a)(1), and have a right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.," *id.* § 2614(a)(1)(A)-(B). Leave taken under the FMLA "shall not result in the loss of any employment benefit

---

[5] Exhaustion of remedies is not required with respect to Plaintiff's FMLA discrimination and/or interference claim in Count III.

13

accrued prior to the date on which the leave commenced." *Id.* § 2614(a)(2). However, a restored employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3)(B).

These substantive rights, and their accompanying protections are prescriptive, "set[ting] substantive floors for conduct by employers, and creating entitlements for employees." *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998). Claims of alleged violations of these prescriptive rights—known as "interference" or "entitlement" claims—arise under 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

In addition to these prescriptive rights, the FMLA also contains proscriptive provisions that protect employees from discrimination or retaliation for exercising their substantive rights under the FMLA. *See id.* at 159–60. Known as "retaliation" or "discrimination" claims, causes of action alleging violations of these proscriptive rights arise under 29 U.S.C § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006).

"A retaliation claim under the FMLA differs from an interference claim under the FMLA in that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Bosse v. Balt. Cnty.*, 692 F. Supp. 2d 574, 588 (D. Md. 2010).

To establish unlawful interference with an entitlement to FMLA benefits, a plaintiff must prove that: "(1) she was an eligible employee; (2) her employer was covered by the statute; (3)

she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled." *Wonasue v. Univ. of Maryland Alumni Ass'n*, 984 F. Supp. 2d 480, 495 (D. Md. 2013) (quoting *Rodriguez v. Smithfield Packing Co.*, 545 F. Supp. 2d 508, 516 (D. Md. 2008)). She must also show "that the violation prejudiced her in some way." *Id.* (quoting *Anderson v. Discovery Commc'ns, LLC*, 517 Fed. Appx. 190, 197–98 (4th Cir.2013), *as amended* (May 3, 2013)). "In addition to denying FMLA benefits, interference may include refusing to authorize FMLA leave; discouraging an employee from using such leave; avoiding responsibilities under FMLA; and using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." *Sherif v. Univ. of Maryland Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015) (quotations and alterations omitted); *see also* 29 C.F.R. § 825.220(b), (c).

Plaintiff has failed to proffer evidence showing either that Defendant interfered with her leave in any fashion or that she suffered prejudice. Although the Complaint alleges that she was negatively evaluated for failing to complete the language course assigned as part of her PIP during her leave of absence, none of the PIP status reviews or evaluations in the record make any mention of this. Indeed, the only evidence in the record relating to this point refutes this allegation. The record contains a letter of August 2, 2017 from Mr. Kaplow to Plaintiff summarizing their status meeting on Plaintiff's PIP the day before. *See* [Doc.27-9]. The letter states:

> The Performance Improvement Plan includes three requirements regarding coursework:
> - By June 1, 2017 you were to provide a list of courses for which you would register, including general grammar and writing, Access, Google Docs.
> - By June 15, 2017 you were to provide a plan for the completion of the courses noted above.

- By June 30, 2017 you were to register for a general grammar course.

None of the requirements listed above have been met. You have not provided a complete list of courses. You have not provided a plan to complete coursework. And, you have not provided information that confirms that you have registered for a grammar course.

During our discussion you stated that you registered for a grammar course that began on July 12, 2017. However, the information you provided (in an e-mail) did not confirm that you were registered, it was only a general description of the class. You also said that you were unable "go to it" because you were on Family Medical Leave. I respect that, however, the information indicated that the class was online and available anytime, 24-hours each day beginning July 12th, which may allow you to still participate.

Please confirm that you are registered for this course or let me know your plan to register and complete an alternative course. Thank you.

*Id.* at 1 (emphasis omitted).

These comments do not constitute a "negative evaluation" of Plaintiff based on her failure to do coursework during her FMLA leave. Mr. Kaplow stated that he "respect[ed]" that Plaintiff was unable to do coursework during her leave but believed, based on the information she provided, that the course was still available and therefore asked her to share her plans for completing the course. If anything, these comments demonstrate that Mr. Kaplow did not factor Plaintiff's failure to complete the course into his evaluation of Plaintiff's PIP progress. Moreover, the record documents an occasion on which Mr. Kaplow *admonished* Plaintiff for doing work during her FMLA leave and firmly instructed her not to do any work during such leave. In his August 2, 2017 evaluation of Plaintiff's PIP progress, Mr. Kaplow reported that Plaintiff had told him that she had been working at home on a project given to her before she began her leave. [Doc. 27-26 at 40]. He then thanked Plaintiff "for taking this project seriously and devoting your time to it" but stated,

[A]s I stated several times, please do not work from home, particularly while on FML. I emphasized that there are very few occasions when one should, or is

> permitted to, work from home. I mentioned that we must comply with labor standards and FML guidelines regarding work schedules and working from home. You did not respond to me. I felt it was important that this expectation be understood, so I asked, "Lillian, did you hear me." You responded, "yeah." Again, I appreciate your effort, but I want to ensure you understand, and comply with, the work expectations. Thank you.

*Id.*

In sum, Plaintiff has failed to point to any evidence showing Defendant's interference with her FMLA rights or any prejudice she suffered from the alleged interference.

As to Plaintiff's allegations of Defendant's violation of the FMLA's proscriptive provisions, namely, its alleged FMLA discrimination and/or retaliation against her for taking FMLA leave in July 2017, the *McDonnell Douglas* burden-shifting framework applies.[6] She must therefore establish a *prima facie* case by showing "that [s]he engaged in protected activity, that the employer took adverse action against h[er], and that the adverse action was causally connected to the plaintiff's protected activity." *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998). It is undisputed that Plaintiff engaged in protected activity (taking FMLA leave in July 2017) and experienced an adverse employment action (she was terminated). Here again, however, the issue is whether she has shown a causal connection between her FMLA leave and her termination. Based on the record before the Court, she has failed to proffer evidence that would allow a reasonable fact finder to find that causation.

---

[6] The Fourth Circuit has previously construed a plaintiff's claim that he was evaluated negatively and terminated because he took FMLA leave as a "retaliation" claim, suggesting that there is no functional distinction between FMLA "retaliation" and FMLA "discrimination" or the legal standards applicable to such claims. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550–51 (4th Cir. 2006) ("In addition to claiming an interference with his FMLA rights, Yashenko contends that Harrah's retaliated against him for taking protected leave. FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the [*McDonnell Douglas*] burden-shifting framework . . . . It is undisputed here that Yashenko engaged in a protected activity (taking FMLA leave) and that he experienced an adverse employment action (termination). Thus, to establish his prima facie case, Yashenko must demonstrate that there was a causal connection between his taking leave and his termination.").

First, Mr. Kaplow recommended her termination in December 2017, five months after she returned from FMLA leave. Thus, the interval between her protected activity and her termination was not short enough to establish a causal connection standing alone. *See Dowe*, 145 F.3d at 657; *Price*, 380 F.3d at 213. Moreover, Plaintiff's other allegations do not establish a causal connection because they are not supported by the evidentiary record. Mr. Kaplow extended her PIP period by approximately three months until October 31, 2017 to give her additional time to satisfy the PIP's requirements, which *helped* Plaintiff and *accommodated* her FMLA leave rather than punished her for taking such leave. *See* [Doc. 27-26 at 1 ("The original PIP . . . expired on July 15, 2017. However, during the initial term of the PIP, you were absent from work for an extended period of time due to Family Medical Leave. Therefore, the PIP was extended through October 31, 2017, to allow you more time to demonstrate significant progress towards the goals . . . .")]. She was clearly not prejudiced by the PIP extension. Indeed, had he enforced the original PIP deadline, she arguably would have been unfairly prejudiced by her having taken FMLA leave.

Further, as discussed, there is no evidence in the record to support the assertion that she was punished for not completing coursework during her leave. As to the allegation that she was given negative marks for attendance due to her FMLA leave, the evidence does not support this allegation but instead shows that the negative marks she received for her attendance were premised on absences she incurred after returning from FMLA leave. In his August 2, 2017 evaluation, Mr. Kaplow never referenced Plaintiff's FMLA leave in connection with her attendance, and the only attendance concern he referenced was her failure to request permission for absences on occasions on which she took non-FMLA leave.[7] *See* [Doc. 27-9 at3]. The only

---

[7] The full text of these comments is as follows:
    **Secure permission to take leave rather than stating the leave as a fact.**

other mention in the record of Plaintiff's attendance after she went on FMLA is recorded in Mr. Kaplow's September 5, 2017 memorandum extending the PIP period to October 31, 2017. In that memorandum, Mr. Kaplow stated as follows regarding her attendance:

> Last year (July 2016 through June 2017) your absences were excessive and attendance continues to be a concern. You were on Family Medical Leave for most of July. However, since your return, you have been absent 25% of work days (6 absences in 24 work days, August 1 through September 1).

[Doc. 27-13 at 2]. Thus, these communications do not reflect that Plaintiff's FMLA leave was factored into the decision to recommend her termination. Rather, these comments reflect concerns over her excessive absences related to her attendance from July 2016 through June 2017, and then her 25% absence record after she returned from FMLA leave. Moreover, the memorandum recommending Plaintiff's termination did not reference any attendance issues, so it is unclear how this reference to attendance constituted an adverse employment action. *See generally* [Doc. 27-26].

For the above reasons, Plaintiff has failed to proffer evidence sufficient to establish that her FMLA leave was causally connected to any adverse employment action. Accordingly, Plaintiff has failed to meet her burden to establish a *prima facie* FMLA retaliation case.

## IV. CONCLUSION

For the above reasons, there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law as to Plaintiff's claims for unlawful retaliation, as set

---

This expectation is not being met.
- On Wednesday, June 28, 2017, you came to the doorway of my office and stated: "I'm taking leave tomorrow, Bobbie [Jaeger] will call you."
- On the afternoon of Friday, June 30, 2017, you came to my office and stated, "I won't be here Monday, I'm taking leave." Subsequently, you were absent from work on Monday, July 3, 2017."

[Doc. 27-9 at 3].

forth in Counts I, II and III. Defendant's Motion for Summary Judgment Filed Pursuant to Fed. Re. Civ. P. 56(a) [Doc. 24] is therefore GRANTED; and this action is DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record and to enter judgment in favor of Defendant pursuant to Federal Rule of Civil Procedure 58.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 12, 2019